In his official capacity as Secretary of Health and Human Services at Applebee's, Projects Go ahead and approve another manufacturer. Now, the holder of the approved application is the holder referenced in subsection A, the one who holds the application that enjoys exclusivity, that's barring others from getting into the market. Now, it does not make sense for Congress to say you only look at whether or not the holder of the approved application to supply the market if, in fact, there were going to be a series of exclusivity holders supplying that market. We all agree that the first comer gets to stay in the market. On Eagle's reading, the second comer gets to enjoy what the district court calls a duopoly. You both get to be in the market. But this provision does not make sense if there are multiple suppliers, a sort of series of exclusivity holders supplying the market. Similarly, with B-2, that's the second condition for breaking exclusivity. Congress also referred only to such holder being able to waive their exclusivity. Now think about Eagle's theory. Eagle's theory is that as soon as you get designation, you get designated as an orphan drug manufacturer, you know it is automatic that if you ever get approval for that drug, you are going to get some form of exclusivity period. Maybe not the first one, but you're going to get either the second or the third or the fourth. Remember, their theory is indefinite here. But on this theory, somebody who could have legitimately expected to enjoy a duopoly as soon as the first exclusivity holder had had its seven years of monopoly, that first holder could destroy that expectation by simply waiving its exclusivity, allowing the FDA to let a whole bunch of generics rush into the market. That doesn't make sense. If Congress actually was trying to set up this sort of expectation, Eagle says, this language unambiguously commands, why would Congress have allowed a first exclusivity holder to destroy those legitimate expectations? The better reading of this language — I'm sorry. The first exclusivity holder? I thought you were talking about the second exclusivity holder. In my hypothetical, Your Honor, imagine there's a first exclusivity holder, as there was in this case, Teva Pharmaceuticals. And then you have somebody who maybe simultaneously tried to develop this drug. Right, right. But they hadn't gone across the finish line first. So they're waiting in the wings, and they think, okay, I didn't get years one through seven. Those are Tevas. But I'm going to get years eight through 14, where my only competitor is going to be Teva. It's going to be me and Teva. On Eagle's reading of this statute, under B-2, Teva could have vitiated that second exclusivity holder's expectation by simply going to the FDA and saying, I waive my exclusivity rights. You can let anybody you want to into this market. Or even more nefariously, and this actually happened here, the first exclusivity holder can cut a deal with the second exclusivity holder, which is what Teva and Eagle actually did. They were fighting over the patent rights related to this drug. And as part of that settlement, Teva waived its exclusivity to let Eagle get approved before Teva's seven years expired. Now, Ms. Patterson, though, I mean, these peculiar results, maybe, that were, you know, these scenarios you suggest might result from Section B, I mean, do they somehow, though, undermine what is the very plain language of A, which sets up a pretty clear structure that if you're designated and approved, you get a seven-year exclusivity period? I mean, how do these somewhat, I mean, are these results so peculiar to undermine the very plain language of A, or arguably plain language of A? Well, I want to push back on the idea that A is the sort of unequivocal command that that question is presupposing. And we think that comes from the references both in A and B to the expiration of a seven-year period. Now, expire can just mean the end of one period, but we also think that it can connote sort of just in an ordinary usage way that that period, that seven-year period referred to in both A and B, can expire and not be revived. And in fact, we know that this is how Congress read its own handiwork. Because in 1990, Congress passed legislation premised on the idea that only the first manufacturer to get approval for a particular drug got any sort of exclusivity award. Now, Eagle says these are floor statements, this is post-enactment legislative history. That is not the case. This was a bill passed by Congress and presented to the President, and the President vetoed it. The President vetoed it because the President, like Congress, said, no, we want only the first manufacturer to enjoy exclusivity. Now, maybe that doesn't mean that this provision can only be read that way, but that type of formal legislative action by both on Congress' part and the President's part in vetoing this bill certainly shows that this language can be read in the way FDA has always read it. Congress read it that way. The President read it that way. But is your best argument that A is clearly in favor of your view, the resting on the word expiration? Yes. We think expiration is the source of the ambiguity in A, that in subsection B, Congress' other textual indicators show that they thought that there would be only one exclusivity period that would then expire and not be able to be doled out to second comers who developed no new orphan drugs. So we think the combination of those two things. And I know I'm running into my rebuttal time here. I do want to save a little bit of time. But just looking at the FDA writ large, as, of course, the Supreme Court has instructed us to do, courts don't construe provisions, they construe statutes. There are a lot of exclusivity periods in the Act. None of them are indeterminate. And Congress has shown very clearly that when it wanted that seven-year period to be extended, it used very clear and very different language. If you get the extra exclusivity because you do the infectious disease study, it said that seven-year period shall be extended by five years. If you do extra pediatric studies, it said the seven-year period shall be deemed seven years and six months. That's the type of clear statement, to extend an exclusivity, to take something away from the public, to not let generics into this market. That shows Congress intended to do that. This language here does not. It is ambiguous, and the FDA's resolution was reasonable. I'd like to reserve any time. Before you sit down, am I right that another situation like this cannot come up? In other words, because of the amendment in 2017, an orphan drug manufacturer, in order to get the exclusivity now, has to have a clinically superior drug, which means it's not the same such drug under the statute. That is our understanding, but this case is not limited to its facts. There are a number, I think we count at least 11 drugs, that fall into the same category of being both designated and approved for a drug that is not clinically superior before the effective date of those 2017 amendments. And, of course, each of those 11 drugs could have untold numbers of ANDAs, of follow-on drugs, of generics, who want to or, in fact, already have entered the market. Do you know the last date of the end of the 7-year exclusivity for these other 11 drugs? I don't know, but I assume that it would be 7 days from the day before the enactment of FDARA in August 2017. So it could extend out some time. To 2024. I believe that's right, Your Honor. Thank you very much. Mr. Gar? Can I ask you, before you get started? Yes, Your Honor. When TAVA and EGLE entered into this settlement agreement, and TAVA started commercially marketing Bendeca, and then EGLE asked for the 7-year exclusivity, what was EGLE doing? Was EGLE marketing the Bendeca as well? It had yet come on the market, Your Honor, and I think that's an important point to address, the notion that we somehow had engaged in this nefarious behavior by entering into this licensing arrangement with TAVA. First, to be clear, in terms of the way the statute operates, Section 360CCB12 gives FDA the discretion to grant exclusivity, to allow another product to come on if a current exclusivity holder consents to that. But it doesn't require the FDA to do that. So my friend's suggestion that FDA was somehow bound to do this and that companies could collude into the situation is wrong. FDA simply has the discretion to grant an exception, a waiver in that circumstance. Second, as to the circumstances here, EGLE was a relatively small company that had invested millions of dollars in bringing onto the market, developing and trying to bring onto a market, a product that it believed was clinically superior and substantially improved over Trianda for patients with this rare disease, particularly insofar as it reduced the administration time for this chemotherapy, as well as the volume of sodium that patients endured. And so we believed it was a better drug. FDA ultimately concluded otherwise. But what happened during the course of the development is FDA, in an unprecedented, if not unusual move, retroactively granted Trianda exclusivity on another indication, which essentially left EGLE with no option but to enter into a licensing arrangement with EGLE, with Teva. So the circumstances were unusual. They were driven by market considerations. They were in no way nefarious. And none of this, of course, gives the court license to disregard the unambiguous language of the statute. Well, I mean, we have cases, and you cite, actually, engine manufacturers. Right. But you don't cite the language which says that if the apparent meaning of a particular clause leads to, as the court said, an odd result, I take it it means a quite odd result, then you have ambiguity. And particularly the fit of this with B-1 seems to me clearly an odd result. Well, I don't think that there's an odd result here. I mean, first I would quarrel with the notion that that in itself creates an ambiguity. But I don't think that this result is odd. Well, I mean, you're dealing with our precedent, which we have to deal with, too. No, I appreciate that, Your Honor. But just in terms of the notion that this is odd. The central incentive created by the statute was exclusivity. Having the possibility of additional companies to get subsequent exclusivity increases that incentive, allows companies to go in, develop products that they believe are exclusive. I understand that. I understand that. But the counsel to the FDA pointed to the strange relationship in B-1 in that the granting of the license for another would turn entirely upon the deficiency in the second firm, now the holder of the exclusivity's ability to meet the market. While it might be the case that the original firm was completely, could easily satisfy the market. Well, first of all, Your Honor, again, this is a discretionary provision. B is discretionary. It's a discretionary, but it says that the secretary may. Yes. Authorize this additional firm. But why would it do that if there's actually no problem when you're looking at the substantive goal of the statute in terms of getting an adequate supply out there? Well, the question could come up in different scenarios, including where there's only one drug that enjoys exclusivity. And B is framed, Your Honor, in terms of the current holder of exclusivity. I mean, that follows from reading A and B together. Yeah. And so it makes sense that Congress would use the singular in B-1 rather than the plural because it's talking about a situation. Yeah, but consider what the secretary is doing under this. He lets in, he may, he, she may let in an additional firm simply because the second firm to come into the market and now holding the exclusivity, which, of course, isn't exclusivity because we have the first firm, but anyway, is unable to supply it. That seems crazy. Well, I mean, you're saying a sensible secretary wouldn't do it. I agree with you. And Congress gave it the flexibility, Your Honor. I mean, they could say, look, there's other. Why would Congress give that flexibility, even if we assume that a sensible secretary would not essentially apply this in an inane way? Why would Congress authorize an inane application? I don't think it's inane, Your Honor. I think the situation where it would be needed is where you have one drug that has exclusivity, that drug is unable to meet patient need, and this statute, Congress sensibly gave the secretary the discretion to grant additional exclusivity in that period. You're saying B-1 makes sense only in the instance which you regard as sort of one of the possible things that may flow from the statute, but not the particular one you're advocating. I think it makes sense that Congress would include it in that, for that situation. It could arise in other situations. You could have multiple holders of exclusivity, one that's expired and a subsequent one and still not be able to meet patient needs. I mean, that's certainly possible. Yeah, but why would the secretary look, be directed to look only at the production of the exclusivity holder? Well, again, I mean, I think Congress can have different situations in mind. I think the situation where this is most needed is where there's one exclusivity holder and that exclusivity holder is unable to meet. So you acknowledge then it's a, at least a bad fit for the situation where there are two or more firms in the market already. I wouldn't, Your Honor. I don't think it is, and I don't think it creates ambiguity. Ambiguity, you've got to show two plausible readings of a statute. Now, what's missing from FDA's argument here and what's missing from their briefs is any actual grounding in the statute. They pointed to B-1 here. You're looking only at one clause.  Yes. But engine manufacturers and other cases direct us to look at the entire statutory  We agree, Your Honor. We agree. But I don't think that... Well, okay. It seems to me what you're saying is we have here in B-1 a clause that works as it's written only for one scenario out of the multiplicity that you say the statute creates. Your Honor, it works in the situation of subsequent exclusivities as well because in that situation the Secretary can exercise his discretion not to grant the exception under B-1. I mean, it works perfectly in that situation. He can, but you're... He doesn't. I mean, I think... You aren't explaining why Congress would give him discretion to do it in those circumstances. Yes, and that's... You're saying he may be very sensible and not do it in those circumstances. You aren't explaining the wording. Well, I think that Congress's choice of may instead of shall is itself significant. Congress could have said in B, the Secretary shall grant a waiver in that situation. You'd have a greater problem then. I agree. Right? And so that wording itself, I mean, the Secretary hasn't explained it. We've been using the word exclusivity, and in fact, 355FA uses the word exclusivity, period. But in your scenario, after the initial period, firm one, we have a succession of special entitlements which are not exclusivity. All of them are duopoly, triopoly, tetrapoly, and so forth. Well, the... It's not exclusivity at that point. The exclusivity is the right to hold it during the expiration of the seven years, the orphan drug exclusivity. But it isn't an exclusive. Under the FDA's reading of the statute, the seven-year period is an exclusivity period. Under your reading, it is not exclusive. You're right. I mean, the other drug could continue to sell, Your Honor, but in terms of the period of seven years, the subsequent holder enjoys that period. In that respect, it is exclusive. You don't think we should attach any importance to Congress as having used the term exclusivity, period? The Court would consider that as well, but, I mean, I think you've got to start with 360CCA, Your Honor, and that creates a very clear if-then rule. Well, let's go to A. Now, the first holder is put in a special position by that. It says that, let me find it, the, yes, this is the granting approval for a person who was not the holder of the approved application. So the person who is the holder of the initially approved application is in a special position, and it would appear that looking at, this is the language after two in 360CCA, the initial holder could apply for a new period, use the vernacular and call it exclusivity, and there would be no problem with that. They would have any sense at all, Your Honor, they would have to go through the designation and approval requirements. They already got the designation. And I think in that situation, I think FDA would have a stronger argument that they had enjoyed the exclusivity period and that that period would expire. But, you know, FDA, I mean, the central ambiguity arguments that they pointed to this morning, and their position has evolved over time, which is itself, I think, a telling indication that under Chevron problem one, it seems to me positions can evolve. They can, Your Honor. They've thrown a lot of mud up, and they continue to do so. And with respect, nothing sticks. I mean, the notion that expirate, the use of expiration itself creates ambiguity. The district court here and the district court in Diplomat correctly rejected that. You insist on resolving the ambiguity issue solely on the basis of one clause. Well, I don't think so, Your Honor. That's not what our precedent says. We don't insist on that at all, Your Honor. We would look first to 360 CCA. That's part of the analysis. B, the fact that Congress has granted exceptions for particular situations indicate that it didn't want an exception for other situations. I mean, the central question under Chevron step one for this Court is where FDA has found that a drug meets the statutory requirements of designation and approval, is that drug entitled to exclusivity, the seven-year exclusivity period. And A answers that question in the affirmative. B grants two situations where FDA can grant exceptions, neither of which apply to the added clinical superiority exclusivity stage requirement that FDA has added here and that's at issue. The fact that Congress has expressed particular exceptions but not the one that FDA is asking for here is another indication that Congress should do that. Yeah. You would at least agree that wording of the exceptions can shed light on the meaning of the rule to which they are subject. We do, and we don't think that it creates any ambiguities for the reasons that I gave earlier, Your Honor. I think the Court can also look at the purpose of the statute. The central one of the central purposes, as my friend indicated this morning, was to create an incentive for the developments of these drugs. And our position does just that. The fact that multiple companies can be developing something and continue to have an interest, a statutory incentive to continue to develop it, knowing that it's possible that the other drug will get designation and approval first, but even in that situation, you can continue to develop it and go on to the market later. There's always going to be incentive to differentiate and make a better drug. And here, just to keep in mind, the reason why we're in the position that we're in is that Congress initially designated Bendeca as a drug that provided a plausible, a medically plausible basis for concluding that it is clinically superior. We then went forward and we proved the reasons that we said it was clinically superior. The significant reduction in administration time for patients, which is a huge factor for patients undergoing this type of clinical chemotherapy. Significant reduction in sodium involved in that, which is important, particularly for kidney people with kidney problems. Didn't the FDA concede that convenience of patients with Bendeca was a benefit? They absolutely did, Your Honor. There was something better about Bendeca. It was more convenient to patients. They absolutely did, and I believe that's on page 70 of the J.A., Your Honor. And they ultimately concluded that we didn't meet the clinical superior requirement at the back end, but that's only because of the 2017 amendments. And those are significant, Your Honor. I think usually that the Court is familiar with agencies coming before it and saying that all sorts of bad things will happen if you adopt this interpretation. Well, they were free to present those arguments to Congress. Congress acted. It updated the statute as it saw fit, and it determined that it would apply only on a prospective basis. We don't have any clue why it made that decision, right? We don't, but we do have language in the statute that makes it express. Oh, no. I know, but I understand that that's the law. Right. Absolutely, Your Honor. And what FDA ultimately is, and the courts have done what they were supposed to do up to this point in the depament case in the district court below, which was to give effect to the law that Congress wrote and put the impetus on Congress to change it if the FDA is right that the statute created a problem. Congress did that, and FDA is now asking this Court to go back, rewrite the statute as it existed before the 2017 amendments, effectively render those amendments superfluous, and disregard Congress's express intent to make those amendments prospective only. We would encourage the Court not to do that, to affirm the decision below. I'd be happy to answer any other questions, Your Honor. They gave you until 2022. That's correct. And do you consider yourself, I can't figure out if FDA considers you the first licensee. You're not. It considers us to be the same drug as Triona. If somebody, if I'm a drug manufacturer and I have something that is not clinically superior, I can't get it anyway because the statute has been amended. Well, that's correct. I mean, under the prior, you'd have to come forward and show that your drug is clinically superior, and that's always the way the statute is. And then it wouldn't be the same drug. Right. It wouldn't be out of that. Right. Because that's a question of the scope of exclusivity. All right. And do you agree, frankly, I think Judge Kelly's opinion reads like a roadmap. It covers all the issues. Do you agree with him? I think you do, that the exclusivity is after the first seven-year exclusivity, there's a duopoly and then the gate's open. Yes. But for that initial applicant who would have been Teva, you couldn't have, EGLE couldn't have done what it did without exception B-2, without Teva saying we're waiving. Well, yes, Your Honor, but only because of the unique situation that EGLE was put in because of FDA's virtually unprecedented retroactive approval. I mean, I think it certainly, we went forward, we tried to show that we were a clinically superior drug. FDA acknowledged at the designation stage that we had presented a medically plausible hypothesis for that. It was only at the end that they determined that even though they acknowledged our benefits, we weren't clinically superior. So I think you're right that under B-2, for one of the indications, that exception was invoked. FDA approved it. It didn't have to. I mean, if it truly had thought that this was so nefarious, it could have refused to acknowledge that consent. You know, these sorts of situations are unlikely to rise again. There may be a few other people in this situation, but obviously Congress has addressed the situation as it saw fit. It didn't adopt FDA's position across the board. It provided important protections to companies as well who are developing these drugs, requiring FDA to provide notice of the reasons that it's making clinical superiority determinations, because that was one of the real problems with the prior statute. But this is a situation where the court, for better or worse, doesn't have to worry about these policy circumstances. Congress has addressed them. The court's role, we would respectfully submit, is to give it back to the law that Congress enacted. And we think that the district court below and Judge Jackson before it, in the Dept of Med case, correctly concluded this is a situation where Congress expressed intent unambiguously resolves the question before the court. Thank you. Thank you, Your Honor. Does Ms. Gaven have any time? Does she have any time? All right, why don't you take two minutes. Thank you very much, Your Honor. First, I want to, there's been a lot of talk about how FDA could use its discretion to prevent some of the anomalies that EGLE says Congress intended unambiguously to permit. And I want to point out the evergreening situation, which is actually what's happening in a case called United Therapeutics that's in DDC right now. It's state pending, the resolution of this appeal, where there is a self-evergreening situation happening. And how this works is, you are the first exclusivity holder. You were the first one to create an orphan drug. But before your exclusivity period expires, you say, wait a minute, I can make a better version of this drug. I can reformulate it. I have a new formulation. And you can be designated. Again, we don't want to ratchet up the designation standards. So then, you get approved, because the drug, your variation is safe and effective. Under our reading of the statute, we can say, this is not actually a clinically superior version of the drug. We're sorry, the exclusivity period for what is essentially the same drug has already expired. You don't get another seven years of exclusivity for the same drug. But on EGLE's reading, we would not have the discretion to do that. Because 360 CCA only bars us for approving an application for the same drug for someone who is not the holder of approved exclusivity. So we would have no basis in that scenario, no discretion to say, you don't get another seven years. Well, why wouldn't they have to show it was clinically superior now under the 2017 amendment? They would now, but I think this leads me to my second point, which is that we have, you know, EGLE was just here saying, you don't have to worry about any problems. We think you have to look at the pre-2017 version of the statute as it stood. The 2017 amendments had a rule of construction that said nothing in them should affect what came before. And we think that respecting that rule of construction means that they don't get to use it to say, hey, everything's fixed. And we don't get to use it to say, hey, they like the regime that we had before. Neither side should get to use it. We think Judge Kelly was right about that. And finally, you know, I do want to note that the evergreening situation, I mean, again, that's a policy consideration. It might be, even if evergreening seems like an undesirable policy, it doesn't mean it's excluded by 360 CCA. I think that when you look, I think that when you look to the entirety of the statute, though, did Congress unambiguously mandate that result, especially against the larger backdrop of the FDCA, especially against the backdrop of the 1990 amendments? They don't have to mandate that result. They just have to mandate a regime that may have inadvertently or may be inadvertently allowed such a situation. Well, I think what they mandated, Your Honor, is a seven-year period of exclusivity. But this reading gets you to an indefinite period of exclusivity. I think that's a plaintext hook for saying, no, when Congress says seven years, it meant seven years. It did not mean 7, 14, 21, 28. The Court has no further questions. We ask it to reverse.
judges: Henderson, Rao, Williams